IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| $96,480.00 in United States Currency, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN MICHAEL HUGHES, | ) | Case No. 15-cv-0573-MJR-RJD |
| ERIC RAYMOND WISNIEWSKI, | ) | |
| and JASON A. HUGHES, | ) | |
| | ) | |
| Interested parties, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN M. KOMIE, | ) | |
| and JASON A. HUGHES, | ) | |
| | ) | |
| Claimants. | ) | |

<u>ORDER</u>

REAGAN, Chief Judge:

I.      Introduction

This case is now before the Court on Claimant's Motion to Suppress $96,480.00 of

United States Currency that was seized during a traffic stop on December 16, 2014 in

unincorporated Madison County, Illinois.   The Court held an initial suppression

hearing on December 16, 2016, with an additional hearing on January 26, 2017.  On February 22, 2017, the undersigned entered a skeleton Order denying the Motion to Suppress to allow the parties to prepare for a rapidly approaching trial date, with the expectation that a more complete order would follow (Doc. 87).  This document serves as the aforementioned follow-on Order.

## II.    Facts

At the December 16, 2016 and January 26, 2017 hearings, Officers Chris Modrusic, Larry Brantley, Kale Pirtle, Jesse Fulkerson, Matt Plassman and Kevin Thebeau testified; claimant, Jason Hughes, also testified.  Prior to the evidentiary hearings, the parties also submitted various affidavits and sworn responses to requests for admissions.  The following facts take account of the live testimony and documentary evidence, giving preference to live testimony.

On December 16, 2014, officers from the Pontoon Beach Police Department stopped a silver Chevrolet Impala traveling westbound on I-70 near mile marker 19.  The officers who conducted the initial stop—Larry Brantley and Chris Modrusic—were Pontoon Beach Police officers, deputized to work for the Drug Enforcement Administration ("DEA").  On that day, they were working a drug interdiction shift, monitoring traffic on Interstate 70.  Before the stop their vehicle was stationary in a median turn-around.

Officer Brantley testified that he was monitoring traffic for a car that 'looked good.'  He observed the Impala drive by with out-of-state plates, and chose to follow it. On the first day of testimony he indicated that he was not sure if he observed the Impala following too closely before pulling out of the median, though on the second day, he said he saw the following violation prior to pulling out.  In any event, he activated his lights and the vehicle came to a stop near mile marker 19 on Westbound I-70.

Mile marker 19 is located within unincorporated Madison County.  The nearest town is Marine.  A map used at the hearing and submitted into evidence shows that mile marker 19 is not within Pontoon Beach, nor is it a part of an adjoining municipality.

Upon stopping the Impala, Officer Brantley approached the passenger's side, while his partner for the day—Officer Modrusic—stood cover near the squad vehicle. Officer Brantley testified that when the Impala passed him on the interstate he thought it was a solo driver, but when he approached the car he noted a passenger who appeared to be awakening from a nap.  He testified that the passenger appeared confused to find an officer at the car window.  The passenger—Claimant Jason Hughes—disputes that he was sleeping at the time.  Instead, he testified that he had his seat reclined to rest, but that he was awake at the time of the stop.

Officer Brantley testified that he stopped the Impala for following too closely. Officer Brantley was unable to describe the vehicle being followed too closely, or to describe how he determined that it was following too close, though he did not use a radar gun or any special equipment to make his observation. Officer Modrusic said that he was looking at the computer when Brantley decided to follow the vehicle, but that he did ultimately observe the following too closely. He could not describe the following offense in more detail. By contrast, Hughes testified that he and driver Eric Wisniewski were not following any vehicle too closely at the time of the stop.

At the vehicle, Officer Brantley secured the driver's license of Wisniewski and asked Wisniewski to accompany him to the squad car. Wisniewski complied and sat in the front of the squad while Officer Modrusic performed a license check. Brantley returned to the vehicle to speak with the passenger, Hughes.

Officer Brantley asked Hughes about the nature of his travel and his destination, to which Hughes responded that he was returning home to Colorado after attending Uncle Jim's funeral in Pittsburgh, Pennsylvania. Brantley then returned to the squad vehicle and entered a consensual conversation with Officer Modrusic and driver Wisniewski. Officer Brantley believed he returned to the squad car around 11:20a.m.. By joining the conversation, Brantley quickly realized that Hughes and Wisniewski had different stories. Hughes said the funeral was in Pittsburg, but Wisniewski said it was

in Indianapolis.  Pressed on the matter, Wisniewski began to display nerves, staring at the ceiling and pausing, while adjusting his story.

Based on the inconsistency, Brantley returned to the Impala to speak with Hughes a second time.  Brantley believed that on this second occasion he secured Hughes' license to run a check and/or he asked for the rental care agreement.  This second trip occurred about 15 or so minutes in to the stop.  At some point, Brantley and Modrusic spoke briefly outside of the squad car to confirm with each other that there appeared to be differing stories.  At some point Hughes also exited the Impala and told Brantley that he could contact someone to verify their whereabouts, which Brantley said was unnecessary.  As the officers worked to straighten out the story, they contacted Officers Kale Pirtle and Jesse Fulkerson who were on hand as a canine unit that day.

By 11:35a.m. the canine unit responded to the scene and Officer Pirtle prepared to conduct a sniff with his canine, Dallas.  Officers Matt Plassman and Kevin Thebeau also arrived around the time the sniff was initiated.  Both the driver and the Claimant refused to consent to a search of the vehicle.  The driver ultimately is alleged to have said "I don't care" to the suggestion of a dog sniff.  Officer Pirtle testified that after he had secured Hughes away from the vehicle, he removed Dallas and gave the hand command for Dallas to search the vehicle.

Dallas immediately began circling the vehicle.  On his first pass Dallas alerted to the seam of the rear passenger door.  Dallas alerts by quickened breathing, tail wagging,

a pronounced head jerk, and pawing at the area he alerts to.  Dallas exhibited these signals on the Impala.  Officer Pirtle does not reward Dallas roadside.  He put Dallas back in the vehicle upon alert.  Officer Modrusic testified that he saw Dallas alert.

Officer Fulkerson then opened the trunk at Officer Thebeau's command.  Inside the trunk the officers observed two gift wrapped packages with tags.  An officer may have asked Claimant Hughes about who the packages belonged to prior to opening one, though the record is not exceedingly clear on this point.  Officer Thebeau opened one package, revealing a large sum of United States currency vacuum packed and concealed in a Disney Frozen blanket.

Upon discovering the currency, the occupants of the vehicle were handcuffed and transported separately to the Pontoon Beach Police Department.  Officer Brantley drove the Impala to the department where it was placed in the Sally port for a more thorough search.  The occupants were either placed in detention cells or conference rooms.  Additional facts about the search at the station are not relevant to a decision on the Suppression Motion, so the Court will omit these facts at this time.

### III.    Applicable Law

This section gives a general overview of asset forfeiture.  In the case at bar, there are not any past or present criminal charges pending in relation to this stop.  After this broad overview, the analysis will dissect this stop step-by-step to assess the appropriateness of suppression.

Civil forfeiture proceedings are governed by statute, by the Federal Rules of Civil Procedure, and by the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the latter referred to in this Order simply as "Supplemental Rules"). Certain property is subject to forfeiture by the United States, pursuant to 21 U.S.C. § 881. The United States Attorney General may elect to seek criminal forfeiture under 18 U.S.C. § 982 or civil forfeiture under 18 U.SC. § 983. *See United States v. $133,420 in U.S. Currency*, 672 F.3d 629, 634 (9th Cir. 2012).

Criminal forfeitures operate *in personam* against the defendant and serve as a penalty upon conviction. By contrast, civil forfeitures operate *in rem* against the property itself, "under the theory that the property is guilty of wrongdoing." *See United States v. Duboc*, 694 F.3d 1223, 1228 (11th Cir. 2012). In a civil forfeiture proceeding, the property owner's culpability is not considered in determining whether the property should be forfeited. *See United States v. Cherry*, 330 F.3d 658, 668 n. 16 (4th Cir. 2003); *Vereda, Ltda. v. United States*, 271 F.3d 1367 (Fed. Cir. 2001). While a conviction is necessary to uphold a criminal forfeiture, conviction is irrelevant in a civil forfeiture proceeding. *United States v. One Piper Aztec F De Lux Model 250 PA 23 Aircraft*, 321 F.3d 355 (3d Cir. 2003)." 3 Crim. Prac. Manual § 107.4 (2012).

Section 881 provides, inter alia, for the forfeiture to the United States of property used in the commission of federal controlled substance violations punishable by more than one year in prison. *See* 21 U.S.C. § 881; *United States v. Real Property Located at*

*15324 County Hwy E,* 332 F.3d 1070, 1072 (7th Cir. 2003).   One subsection, § 881(a)(6), provides for forfeiture of money or things of value furnished or intended to be furnished in exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys used or intended to be used "to facilitate any violation of this subchapter."   In other words, § 881(a)(6) authorizes the civil forfeiture of any property derived from the proceeds of a drug transaction, traceable to the transaction, or intended to be used to facilitate a controlled substance offense.

In a civil forfeiture proceeding, the government bears the burden of establishing by a preponderance of the evidence that the property is subject to forfeiture.   If the government's theory is that the property was used to commit or facilitate the commission of a criminal offense, the government must establish that there was a substantial connection between the property and the offense.

The Seventh Circuit has explained the civil forfeiture provision of the Controlled Substances Act, 21 U.S.C. § 881(a)(6), as follows:

> Civil forfeiture standards are now subject to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983(c)(1). CAFRA heightens the government's evidentiary burden in civil forfeitures - the government must demonstrate by a preponderance of the evidence that the property sought is subject to forfeiture. … Furthermore, § 983(c)(3) provides that 'if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.'

*United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, **403 F.3d 448, 454 (7th Cir. 2005) (internal citations omitted).**  So, the Court pointed out in *Thirty Thousand Six Hundred Seventy Dollars*, a claimant's "cash hoard may be subject to forfeiture if the currency at issue represents the proceeds of an illegal drug transaction or was intended to facilitate such a transaction."  ***Id.* at 454.**

District Courts enjoy original subject matter jurisdiction over civil forfeiture proceedings via 28 U.S.C. §§ 1345 and 1355.  ***See, e.g., United States v. Marrocco*, 578 F.3d 627, 632 n.3 (7th Cir. 2009); *United States v. Tit's Cocktail Lounge*, 873 F.2d 141, 142 (7th Cir. 1989) (*per curiam*).**  Venue lies, inter alia, under 28 U.S.C. § 1395, which includes "any district where such property is found.").  ***See* 21 U.S.C. § 881(j).**

## IV.    Analysis

### a. Preliminary Question—Suppression in Asset Forfeiture

One issue not briefed by the parties but bearing mention is the preliminary question of whether a Fourth Amendment-based suppression motion is proper in an *in rem* civil forfeiture proceeding like the case at bar.  This Court attempted to get the parties to address this issue by directing supplemental briefing on the issue of standing specifically as it related to the motion to suppress, but such direction proved fruitless in evoking a more thorough conversation of the propriety of suppression in the civil forfeiture context.  The federal courts have not answered this question uniformly.  Some Courts of Appeal have held that since civil forfeiture proceedings are quasi-

criminal in nature, the exclusionary rule applies, and suppression motions may be filed. *See, e.g., United States v. $291,828.00 in U.S. Currency*, **536 F.3d 1234, 1236-38 (11th Cir. 2008) ("The Fourth Amendment exclusionary rule applies to civil forfeiture actions.");** *United States v. $493,850.00 in U.S. Currency*, **518 F.3d 1159, 1164 (9th Cir. 2008) ("The exclusionary rule applies in civil forfeiture cases…. It bars the admission of evidence obtained in violation of the U.S. Constitution, as well as 'fruits of the poisonous tree.'").** Other courts have voiced uncertainty about the use of suppression motions in civil forfeiture actions.  A 2009 Seventh Circuit case furnishes an example.

In *Marrocco*, **578 F.3d at 631 n.5,** the Seventh Circuit sidestepped the potential obstacle, because the Government had not argued that the remedy of suppression is unavailable in forfeiture proceedings under 21 U.S.C. § 881.  However, in his concurring opinion, Judge Easterbrook expressed concern with the assumption that suppression motions are appropriate in civil forfeitures:

> All parties assume that the exclusionary rule applies to forfeiture, so that the *res* must be returned if it was improperly seized.  Yet the Supreme Court has twice held that the exclusionary rule is not used in civil proceedings.  *See INS v. Lopez–Mendoza*, **468 U.S. 1032 … (1984) (deportation);** *United States v. Janis*, **428 U.S. 433 … (1976) (taxation).** *See also Pennsylvania Board of Probation & Parole v. Scott*, **524 U.S. 357 … (1998) (rule inapplicable to probation revocation).**  Although *One 1958 Plymouth Sedan v. Pennsylvania*, **380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965)**, suppressed evidence in a forfeiture, *Janis* stated that this was because that forfeiture was intended as a criminal punishment.  **428 U.S. at 447 n. 17….**  The forfeiture in our case is civil. It is farther from a criminal prosecution than is a probation-revocation proceeding.

Suppressing the *res* in a civil proceeding, even though the property is subject to forfeiture, would be like dismissing the indictment in a criminal proceeding whenever the defendant was arrested without probable cause. The Supreme Court has been unwilling to use the exclusionary rule to "suppress" the body of an improperly arrested defendant…. Why then would it be sensible to suppress the *res*?

*Marrocco*, 578 F.3d at 642.

Similarly, the District Court for Northern District of Illinois has pointed out: the Supreme Court has suggested that, barring "egregious" Fourth Amendment violations, the exclusionary rule does not apply in civil proceedings.  **See *Krasilych v. Holder*, 583 F.3d 962, 967 (7th Cir. 2009) (*citing Lopez-Mendoza*, 468 U.S. at 1050-51).**  The primary purpose of the exclusionary rule is to deter unlawful police conduct.  Courts have generally held that application of the exclusionary rule to criminal trials alone creates an adequate deterrent; any marginal benefit gained by extending the exclusionary rule to civil proceedings tends to be outweighed by the social cost of losing probative evidence.  **See generally *Janis*, 428 U.S. at 437 (noting that the Supreme Court had never applied the exclusionary rule to a civil proceeding at the federal or state level).**

The Seventh Circuit again acknowledged uncertainty about the applicability of the exclusionary rule in asset forfeiture in **United States v. $304,980.00, 732 F.3d 812, 818 (7th Cir. 2013).**  There, the Court avoided squarely answering the question by pointing to the Supplemental Rules and collapsing the question of exclusion into the assumption that because the Supplemental Rules give a potential Claimant standing to challenge a forfeiture, the exclusion issue need not be addressed.

The undersigned still shares Judge Easterbrook's reservations regarding the use of exclusionary rule-based suppression motions in civil forfeiture proceedings. However, here, as in *Marrocco* and as in *$304, 980.00*, the Government has not argued that suppression motions are unavailable in civil forfeitures.  And the Seventh Circuit has not squarely held the exclusionary rule inapplicable to such proceedings.  So the undersigned will reach the merits of Claimant's Fourth Amendment challenge, after addressing whether Claimant has standing to context the seizure of the *res* herein.

### b. Standing in Asset Forfeiture

In a civil forfeiture proceeding, a claimant must satisfy two separate thresholds of standing:  (1) statutory standing, and (2) constitutional standing.  ***See, e.g., United States v. U.S. Currency in the Amount of $103,387.27*, 863 F.2d 555, 561 n.10 (7th Cir. 1988).**  To have statutory standing, a claimant must file a verified claim outlining his interest in the property within certain specified time limits.  The filing of a proper claim is "an essential element of … standing to contest [a] forfeiture."  ***United States v. U.S. Currency in the Amount of $2,857.00*, 754 F.2d 208, 215 (7th Cir. 1985).**

Constitutional or "Article III" standing requires an individual to have a sufficient interest in the property to contest the forfeiture.  ***United States v. Stokes*, 191 Fed. Appx. 441, 444 (7th Cir. 2006).**  Under Article III of the United States Constitution, federal judicial power extends only to cases or controversies.  Generally, to establish standing, plaintiffs must show (a) they suffered an injury in fact, (b) there is a causal

connection between the injury and the conduct complained of, and (c) it is likely the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, **504 U.S. 555, 560-61 (1992).  *See also G & S Holdings, LLC v. Continental Cas. Co.*, 697 F.3d 534, 540 (7th Cir. 2012) (To establish a case or controversy, the party seeking relief in federal court must demonstrate "a personal injury fairly traceable to the … allegedly unlawful conduct and likely to be redressed by the requested relief.").**

Claimants in civil forfeiture actions "can satisfy this test by showing that they have 'a colorable interest in the property,' … which includes an ownership interest or a possessory interest."  *$133,420 in U.S. Currency*, **672 F.3d at 637-38.**  "Article III's standing requirement is thereby satisfied because an owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property."  *Id., quoting United States v. $515,060.42*, **152 F.3d 491, 497 (6th Cir. 1998).  *See also United States v. 5 South 351 Tuthill Road, Naperville, Illinois*, 233 F.3d 1017, 1023 (7th Cir. 2000) (claimant in a civil forfeiture proceeding has constitutional standing if he as an actual stake in the outcome of the proceedings).**

The Seventh Circuit has taken a liberal approach to the issue of a claimant's standing in the civil forfeiture context.  Recent decisions in 2015 and 2016 indicate that in this Circuit, mere possession of money coupled with a sworn "colorable claim" is enough to establish standing.  *See United States v. Funds in the Amount of $239,400.00*,

**795 F.3d 639 (7th Cir. 2015) (noting that jurists and counsel often conflate the requirements of standing with the merits of the case in civil forfeiture proceedings and holding that "an assertion of ownership combined with evidence that the claimant was in possession of currency when it was seized is sufficient to establish standing at the summary judgment stage of a civil forfeiture action[.]").** The *$239,400.00* case involved a train passenger's ability to lay claim to monies in his suitcase, despite his inability to readily explain why he would have money in such sums. ***Id.*** The Court discussed at great length why it felt that the threshold showing for standing had to be relatively barebones so as not to impermissibly shift the burden of proof from the Plaintiff (the Government) to the Claimant. ***Id.; see also United States v. Funds in the Amount of $271,080*, 816 F.3d 903 (7th Cir. 2016) (finding that two brothers' sworn affidavits claiming money from safe in van were sufficient to get beyond summary judgment even though their latest sworn testimony had inconsistencies with prior statements to law enforcement. Noting that the 'sham affidavit doctrine' was meant for very limited situations where the differences in testimony were so inconceivable that no rational jury could go along with them).**

These recent decisions by the Seventh Circuit create a circuit split on the issue of standing in the civil forfeiture context. The circuits are split on what constitutes a 'colorable claim.' In the Seventh Circuit, a colorable claim can be established via the filing of a claim under Supplemental rule G(5) or (6), plus possession. ***See $304,980.00,***

732 F.3d at 818 ("While it is true that the Davises have not proved their ownership of the cash (indeed, they invoked the Fifth Amendment in response to the government's interrogatories on that subject), they do claim such ownership, and the money was found in Randy Davis's possession.  This is sufficient to give them a colorable claim to the money."); *United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1273-75 (10th Cir. 2008) (a claim of ownership coupled with possession was sufficient to establish standing even though the claimant invoked the Fifth Amendment and refused to explain his ownership interest).  *But c.f. $515,060.42 in U.S. Currency*, 152 F.3d at 498 ("[D]ue to concerns about 'straw man' transfers, 'naked possession' claims are insufficient to establish standing.  When confronted with mere physical possession of property as a basis for standing, we require some explanation or contextual information regarding the claimant's relationship to the seized property….The assertion of simply physical possession of property as a basis for standing must be accompanied by factual allegations regarding how the claimant came to possess the property, the nature of the claimant's relationship to the property, and/or the story behind the claimant's control of the property.").

Here, the parties agree that Claimant has statutory standing to bring a claim pursuant to the Supplemental Rules.  As to Article III standing, the Government made a fleeting attempt to argue that the Claimant does not have constitutional standing by arguing that he disclaimed ownership of certain packages found to contain large sums

of United States currency (*See* Doc. 46  pp. 15-17 (Government's Motion for Summary Judgment) (raising Claimant Hughes's disclaimer of ownership roadside, as well as his inability to provide a legitimate source of the funds); Doc. 69 pp. 5-8 (Government's Response to Claimant's Supplemental Standing Brief) (arguing that Claimant Hughes abandoned the packages at the time of the search by disclaiming personal ownership). At the evidentiary hearing, the Government also attempted to present testimony on this issue to little avail (*See* Doc. 83 pp. 98-120 (Government's cross examination of Claimant Hughes)).  The Government pressed the Claimant on the source of the funds, to which the Claimant responded that he had secured some of the funds in a settlement for an auto accident and that he had won some of the funds in poker tournaments.  The Claimant testified ambiguously about whether he did or did not claim ownership of the packages during the roadside search (*See* Doc. 83 at 114-116 (Government's cross examination of Claimant Hughes)).

In its Proposed Findings of Fact and Conclusions of Law (Doc. 75) the Government repeated the theory of abandonment, but did little to weave together testimony of the officers and the Claimant to prove this point.  Given the paucity of evidence as to whether Claimant disclaimed ownership of the gifts such that he lacked standing, this Court will not decide the case on these grounds at this juncture.  Instead, the Court will maintain focus on the limited issue of suppression of the stop itself.

c.  **The Stop**

The stop itself presents two controversies: first, whether the officers had jurisdiction to make a stop; and, second, whether the officers had a valid purpose for making the stop.

As to the jurisdictional issue, the parties dispute the authority the officers had under Illinois statutes, as well as in their capacity as DEA agents.  Starting with the DEA deputization, found at 21 U.S.C. § 878, the deputization provides that:

(a) Any officer or employee of the Drug Enforcement Administration or any State, tribal, or local law enforcement officer designated by the Attorney General may—
    (1) Carry firearms;
    (2) Execute and serve search warrants, arrest warrants, administrative inspection warrants, subpoenas, and summonses issued under the authority of the United States;
    (3) Make arrests without warrant (a) for any offense against the United States committed in his presence, or (b) for any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony;
    (4) Make seizures of property pursuant to provisions of this subchapter; and
    (5) Perform such other law enforcement duties as the Attorney General may designate.

**21 U.S.C. § 878.**  The Government does not contend that the officers who made the stop (Modrusic and Brantley) were acting to execute or serve a warrant, or that they were actively pursuing a felony offense.  There is also no record evidence of what 'other' duties the Attorney General may have delegated as part and parcel of the deputization.  So, on the record evidence, this Court cannot find that § 878 gave the officers authority to make this stop.

Turning to the Illinois statutes, municipal officers have authority to make arrests and execute warrants in their 'police district.'  *See* **65 ILCS 5/7-4-8 ("The police of any municipality in such a police district have full authority and power as peace officers and may go into any part of the district to exercise that authority and power. …").**  A 'police district' is defined as "the territory which is embraced within the corporate limits of adjoining municipalities within any county in this State[.]"  **65 ILCS 5/7-4-7.** The authority of a police officer is defined as follows:

> Any peace officer employed by a law enforcement agency of this State may conduct temporary questioning pursuant to Section 107-14 of this Code and may make arrests in any jurisdiction within this State: (1) if the officer is engaged in the investigation of criminal activity that occurred in the officer's primary jurisdiction and the temporary questioning or arrest relates to, arises from, or is conducted pursuant to that investigation; or (2) if the officer, while on duty as a peace officer, becomes personally aware of the immediate commission of a felony or misdemeanor violation of the laws of this State…

**725 ILCS 5/107-4(a-3).**

In addition to the formal powers conferred by the aforementioned statutory provisions, Illinois law also provides for a 'citizen's arrest,' whereby any citizen or law enforcement officer may effectuate a stop for the violation of any offense, including a petty offense.  "Any person may arrest another when he has reasonable grounds to believe that an offense other than an ordinance violation is being committed."  **725 ILCS 5/107-3.**  The Illinois motor vehicle statues classify the offense of following too closely as a petty offense.  **625 ILCS 5/11-710 ("Following too closely. (a) The driver of a motor**

**vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."); 625 ILCS 5/16-104 ("Penalties.  Every person convicted of a violation of any provision of this Code for which another penalty is not provided shall, for a first or second conviction thereof, be guilty of a petty offense and, for a third or subsequent conviction within one year after the first conviction, be guilty of a Class C misdemeanor.").**  The Illinois Supreme Court has interpreted the powers of a citizen's arrest to extend to law enforcement officers making an arrest without utilizing special tools of their office.

In the leading decision on the matter, ***People v. Lahr*, 589 N.E.2d 539, 542 (Ill. 1992)**, the Illinois Supreme Court quashed an extraterritorial citizen's arrest because the arresting officer utilized a radar gun to measure a motorist's speed prior to making a stop.  In so holding, the *Lahr* Court was meticulous about identifying the characteristics of *that case* that made it an invalid extraterritorial exercise of police authority.  Namely, the officer in *Lahr* appeared to have his vehicle stationed roadside outside of his jurisdiction where he was using a radar gun to measure the speed of motorists.  *Id.* at **540-41.**  The *Lahr* Court noted:

> Although it is hypothetically possible for a private citizen to obtain a radar gun and conduct his own surveillance of a road, we believe the possibility of this happening is remote.  We believe it is generally true that the use of radar guns for monitoring the speed of traffic is limited to police officers. Therefore, despite the fact that this type of radar equipment is not strictly

> limited to police officers, we believe its use in this case was an assertion of the officer's police authority.

The *Lahr* Court contrasted those facts against cases where officers observed vehicles violating traffic laws by swerving in plain sight, noting that the plain sight observation allowed for a valid citizen's arrest. *See id.* **at 541-42.**

An Illinois appellate court has further defined the scope of a citizen's arrest, stating that, "[t]he use of powers and equipment limited to peace officers is acceptable in an arrest under section 107-3[…], provided that such powers and equipment are not used out of jurisdiction to *gather the evidence* that justified the arrest[.]" ***People v. Kleutgen*, 833 N.E.2d 416, 420 (Ill. App. Ct. 2005) (emphasis added).** In *Kleutgen*, the Court found that an officer's use of emergency lights did not invalidate a citizen's arrest because the lights were not used to gather evidence of the offense of improper lane use. Instead, the lights were only used *after* the officer visually observed the motorist's vehicle veering in-and-out of its lane. ***Id.* at 419.**

Here, the offense conduct—following too closely—was a petty misdemeanor. The officers observed the conduct and made the stop outside of their municipal jurisdiction. Though they were acting as part of a DEA enforcement task force, the DEA deputization does not confer any explicit authority on them to make a stop for a *petty* offense. Hypothetically such authority *could* fall within the "other law enforcement duties as the Attorney General may designate," but the record lacks evidence to support such authority. The officers lacked jurisdiction under state statutes because the offense

was not a felony or a misdemeanor. The officers also had no authority for acting outside of their municipality but within their police district because the area of the stop was not within their municipality or an adjoining municipality. Thus, the only potential source of authority was that of a citizen's arrest.

The officers' actions were appropriate as a citizen's arrest because, like the scenario in *Kleutgen*, the officers did not use any special police instrumentality to *gather evidence* in support of making the stop. Officers Brantley and Modrusic testified credibly that they made the stop after they visually observed the Impala traveling too closely to another motorist. Claimant Hughes contested this assertion, arguing that he was reclining to rest but that he did not see any vehicles being followed too closely. Officer Brantley refuted this point, testifying that Hughes appeared to be just awakening when Brantley approached the passenger side window. The Court found the officers' testimony to be more credible on this point, a finding which supports a valid citizen's arrest.

What is more, even if the officers lacked jurisdiction to make this stop, the Seventh Circuit has explicitly held that a local law enforcement officer acting beyond the bounds of his jurisdiction does not necessarily violate the Fourth Amendment**. *See Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 526-27 (7th Cir. 2001).** "A violation of a state statute is not a *per se* violation of the federal Constitution. The federal government is not the enforcer of state law." ***Id.* at 526.** Thus, the Seventh

Circuit declined to find a Fourth Amendment violation where forest preserve officers made an extraterritorial arrest on a warrant, finding in essence that even if there were a minor wrong under state law, there was not necessarily a cognizable remedy under Fourth Amendment and Section 1983 jurisprudence.  *Id.* **at 526-27**.  The same rationale should apply here.  Even if the Pontoon Beach police officers should not have made a citizen's arrest, there is not sufficient information to justify federal Constitutional recourse.  As the Illinois Supreme Court recently noted in the context of the warrantless use of a GPS tracking device, "[d]espite the exclusionary rule's relationship to the fourth amendment, however, there is no constitutional right to have the fruits of an illegal search or seizure suppressed at trial."  ***See People v. LeFlore*, 32 N.E.3d 1043, 1047 (Ill. 2015).**  Thus, this Court declines to suppress the evidence in this case on the basis that the Pontoon Beach officers lacked jurisdiction.

### d.  The duration of the stop/the search

As a final basis for contesting the stop and subsequent discovery of the money, the Claimant argues that the stop was unconstitutionally prolonged, and that the drug dog alert was not reliable.  The Government counters this assertion, arguing that the inconsistent stories of Claimant and the driver, as well as their nervous conduct, gave rise to ongoing reasonable suspicion to continue the stop.

The United States Supreme Court recently spoke on the issue of prolonging a stop to await a drug dog in ***Rodriguez v. United States*, 135 S.Ct. 1609, 1614-17 (2015)**.

In *Rodriguez*, officers stopped a vehicle for swerving on to the shoulder, ran checks on the driver and passenger, issued a warning, and continued the stop for an additional 8-9 minutes to conduct a non-consensual dog sniff around the vehicle. *Id.* The *Rodriguez* Court made much of the fact that the record was not clear on whether or not the officers had suspicion independent of the swerving to prolong the stop, and the Court remanded the case for further factual inquiry into that issue. *Id.*

Of particular relevance to the case at bar is the Seventh Circuit's recent holding in ***United States v. Sanford*, 806 F.3d 954 (7th Cir. 2015)** where the Court held that the 26-27 minute duration of a stop to allow a drug dog to arrive and complete a sniff was not unreasonable. The officers in *Sanford* initially stopped a rental vehicle for speeding, removed the occupants, ran license checks, and could have issued a ticket but continued the stop for a drug dog to arrive. ***Id.* at 956-60.** Judge Posner specifically noted in *Sanford* that the stopping officers had reasonable suspicion—namely information that the occupants may have been gang-involved, and a rather implausible story of the purpose of their travel—that gave them reason to prolong the stop a bit longer than necessary to address a traffic violation. *Id.* Such information, Judge Posner reasoned, was the very type missing in *Rodriguez*. *Id.*

Here, the officers testified credibly that as the stop progressed they had sufficient reasonable suspicion to justify prolonging the stop. Notably, during the first 10-15 minutes of the stop, Officers Modrusic and Brantley discovered that the driver and

passenger had different stories about their reason for travelling on December 16, 2014. Although both men indicated that the purpose of their travel was Uncle Jim's funeral, they gave different places for the funeral—Pittsburgh and Indianapolis. When confronted with the inconsistency, the men became increasingly nervous and agitated. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, **120 S.Ct. 673, 676 (2000).** Inconsistent stories can also give rise to reasonable suspicion. ***United States v. Muriel*, 418 F.3d 720, 722-23 (7th Cir. 2005) (officer made a stop for following too closely and then discovered inconsistent stories from the occupant's about the purpose and duration of their travel, the inconsistencies gave rise to reasonable suspicion to prolong the stop).**

The Seventh Circuit has held that officers may ask routine questions while conducting a stop, that they can ask questions unrelated to the purpose of the stop, and that they can even ask questions of passengers without reasonable suspicion. ***Id.* at 725-26;** *Sanford*, **806 F.3d at 958-59 (collecting cases on the reasonable duration of a stop, noting that even though the police 'dawdled in issuing a ticket' their conduct was not so dilatory that it became unreasonable).**

Here, the duration of the stop was not unreasonable in light of the evidence that emerged and developed early on in the stop. The vehicle was stopped at 11:11a.m. and the driver was asked to exit the vehicle to go to the squad car—which he did voluntarily. While Officer Modrusic spoke with the driver and ran a license check,

Officer Brantley spoke with the passenger, Claimant Hughes for a few minutes about the nature of his travel that day.  Brantley returned to the vehicle and entered a consensual conversation with Officer Modrusic and the driver, which quickly revealed the varying stories about the location of Uncle Jim's funeral.  Confronted with the inconsistencies, the driver started looking at the ceiling of the squad car and acting nervous.  Claimant Hughes also exhibited nerves and agitation by visibly shaking, and giving officers a dismissive attitude.  These cues presumably developed over the course of 15-20 minutes.  As the officers attempted to straighten out the stories of the occupants, the men were given opportunities to further clarify the situation, which they were unable to do.

By 11:35a.m. the canine unit arrived on scene to conduct a sniff of the vehicle.  The record evidence suggests that the driver may have consented to the sniff, or said he did not care, but the driver was not on the rental agreement, so his view may have had little authoritative weight.  Claimant Hughes allegedly refused consent for a sniff, but his opposition was of little weight in light of the Supreme Court's holding in *Illinois v. Caballes*, **125 S.Ct. 834, 838 (2005) ("[T]he use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,'—during a lawful traffic stop, generally does not implicate legitimate privacy interests." (internal citation omitted)).**

This Court finds that the duration of the stop, from 11:11a.m. to 11:35a.m., including the time to summon a drug dog, was not unreasonable in light of the facts that were developing as the stop progressed.  The officers did testify at the suppression hearings that they did not have ticket books that day and were not necessarily in a position to write a warning, but those facts ignore the inconsistent stories and nerves that emerged very early in the stop.  The bottom line is that the officers who made this stop did not dawdle unnecessarily in conducting the business of the stop.  They learned very early on that the two occupants had different stories, and they gave opportunities for the stories to be corrected, but the men were unable to correct them.  Officers are not required to set their common sense aside during a basic traffic stop.  These officers engaged in very simple conversation that could have lead any reasonable officer to be suspicious.  Thus, the duration of the stop was not unreasonable.

Finally, turning to the search, the Claimant argues that the Government failed to demonstrate that the drug dog—Dallas—was reliable enough to justify a warrantless search of the vehicle.  Like many of the other factual disputes in this case (whether or not there was a following too close violation, who owned the packages in the trunk, etc.) this issue essentially boils down to a swearing contest between the officers and the Claimant because no dog expert was called and no log books of reliability of the dog were produced.  The Officers testified credibly and candidly about Dallas, the drug dog. Dallas's handler, Officer Kale Pirtle, admitted that he and Dallas were a relatively new

pair, and that they had not been working together for long at the time of this stop and sniff.  However, Officer Pirtle recited a reasonable and systematic procedure for how he went about the sniff.  Adding to he and Dallas's credibility, Pirtle testified that he does not reward Dallas roadside for a positive alert.

Claimant Hughes testified that he could see part of the sniff, "I saw Mr. [Pirtle] with the dog, Dallas, going around the vehicle and then that is about all I could see.  My line of sight—I couldn't' see the rest of what was going on" (Doc. 83 at p. 125).  So the Court is left with Pirtle's testimony about his methodology for conducting a sniff, Hughes's testimony that he saw the sniff start but did not specifically see or not see the alert, and the testimony of other officers present that they were informed that the dog alerted.  The determination of reliability of the sniff and credibility is difficult, but it is made somewhat easier by evidence about the money line-up in this case.  All officers who participated in this case freely admit that Dallas did not alert to the currency at the stationhouse during a money line-up.  If the officers were fabricating Dallas's alert roadside, they might as well also fabricate the story and say Dallas alerted during the money line-up—something they have not done.  Their candor about the lack of an alert lends credibility to their assertion that Dallas alerted roadside, and that Dallas's alert was reliable.

Based on the foregoing analysis, the Court finds that the balance of the evidence is sufficient to find Dallas's roadside alert reliable.  Accordingly, the Court will not

suppress on this basis.  Once Dallas alerted to the vehicle, the officers had a basis to search the vehicle, and they may "search all areas in the vehicle in which contraband or evidence of criminal activity might be found, including closed containers, packages, compartments, and trunks."  *United States v. Zahursky*, **580 F.3d 515, 523 (7th Cir. 2009).**

## V.    Conclusion

The evidence and record in this case are far from ideal.  From the standing and jurisdictional issues to the reliability of the dog, there are numerous complex issues. However, after having the benefit of live testimony on a number of the issues, the Court is confident that the officers had a legitimate basis to make the stop, that they did not unreasonably prolong the stop, that the occupants' inconsistent stories and nerves created reasonable suspicion to prolong the stop for Dallas's arrival, and that Dallas's alert was sufficient to justify a search.  At minimum, the Court finds it best to allow this case to proceed beyond suppression—a questionable stage in the asset forfeiture context—to a trial for a more thorough consideration of available evidence. Accordingly, the Claimant's Motion to Suppress (Doc. 50) is hereby **DENIED**.

The Court notes that the Government also has a pending Motion for Summary Judgment (Docs. 45, 46).  The Motion turns in large part on the argument that the Claimant disclaimed ownership of or abandoned the packages that were searched.  The Court finds that there is a genuine dispute of material fact on this contention, so

summary judgment cannot be granted at this juncture.  Thus, the Motion for Summary Judgment is hereby **DENIED**.

As for the numerous motions in limine, the Court will address these motions via a separate order.

**IT IS SO ORDERED.**

DATED: March 16, 2017

_s/ Michael J. Reagan_
Michael J. Reagan
United States District Judge